18 A.3d 955

Justin GIMBLE

v.

STATE of Maryland.

No. 133, Sept. Term, 2010.

Court of Special Appeals of Maryland.

April 29, 2011.

612

Renee M. Hutchins (University of MD School of Law, on the brief), Baltimore, MD, for appellant.

Todd W. Hesel (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for appellee.

Panel: EYLER, DEBORAH S., MEREDITH and CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

EYLER, DEBORAH S., J.

A jury in the Circuit Court for Wicomico County convicted Justin Gimble, the appellant, of two counts of possession of cocaine with intent to distribute, two counts of possession of marijuana with intent to distribute, one count each of simple possession of cocaine and marijuana, and one count of possession of drug paraphernalia. He was sentenced to a total of 15 years' imprisonment with all but 6 years suspended.

On appeal, the appellant presents three questions for review, which we have reworded:

I. Did the circuit court err in denying his motion to dismiss?

II. Was the evidence legally sufficient to support his convictions?

III. Did the trial court err in denying his requested jury instruction on destruction of evidence?

For the following reasons, we shall affirm the judgments of the circuit court.

## FACTS AND PROCEEDINGS

The charges in this case stem from events that happened in the late morning of March 26, 2008, when Wicomico County Sheriff's Office Deputy Joel Arnold attempted to effect a

traffic stop of a sedan automobile the appellant was driving, and in which the appellant was the sole occupant. Deputy Arnold had observed the sedan traveling above the posted speed limit. When he drove up behind the sedan to make the traffic stop, the appellant sped off. A chase ensued, with the appellant's vehicle reaching speeds of around 100 mph. Deputy Arnold's patrol vehicle was equipped with a camera mounted on the dashboard, which recorded the entire series of events, beginning with the attempted traffic stop. Deputy Arnold never lost sight of the sedan during the chase.

The appellant failed to negotiate a turn and lost control of the sedan. It veered off into a field and crashed, overturning. Deputy Arnold witnessed the crash. He saw items coming out of the sedan as it overturned. The DVD recording of the crash showed that as well. Items found in close proximity to the overturned vehicle included a camouflage backpack. The backpack was spotted by Deputy Matthew Cook (who had responded to the scene) around 20 feet from the overturned sedan. Inside the backpack Deputy Cook found marijuana and cocaine, clear baggies, a USC 300 digital scale with narcotics residue on it, and various personal items.

The appellant suffered significant injuries in the crash. It took about a half hour to extract him from the sedan. He was transported to a regional medical center. There, Deputy Dennis Taylor confiscated a silver Cingular cell phone and $1,311 in United States currency from a pocket in the appellant's pants, which had been removed by hospital personnel. The appellant was transported to the Shock Trauma Unit in Baltimore for treatment of his injuries.

We shall include additional facts in our discussion of the issues.

## DISCUSSION

### I.

### *Motion to Dismiss Charges*

The case was scheduled for trial on January 20, 2010. Three months before then, on October 19, 2009, defense

counsel made discovery requests of the State. On October 29, 2009, he received in response documents, including police reports and evidence logs, detailing the items that had been found in the field near the overturned sedan right after it crashed, and stating that there was a DVD recording of the chase and crash taken from the camera in the patrol vehicle, and there were 11 photographs taken at the crash scene by an EMT responder. Defense counsel asked for the DVD and the photographs. He was provided with the DVD but was told that there were no photographs. (There were many other photographs taken of the crash scene, including one that showed the location of the backpack. They were taken by other responders to the scene.)

As the trial date neared, defense counsel arranged to meet with the prosecutor at the Sheriff's Office on January 15, 2010, to view the evidence. The prosecutor canceled the meeting at the last minute and it was rescheduled for January 19, which was the next business day. (A holiday weekend intervened.) On the morning of January 19, the prosecutor called defense counsel and told him she had learned that the only items of evidence the Sheriff's Office still had for the case were the marijuana and cocaine that were found in the backpack and the money that was seized from the appellant's pants pocket in the hospital. Everything else had been either returned to the appellant's girlfriend or destroyed.

At the outset of the proceedings the next day, defense counsel moved to dismiss all charges on the ground that the appellant's due process rights had been violated by the State's destruction of evidence.[1] Defense counsel complained that the State had destroyed the backpack, personal items in the backpack, and the 11 crash scene photographs. The prosecutor responded that some of the items of evidence had been destroyed mistakenly by the Sheriff's Office in the course of routine purging of its evidence room. She offered to call as a

---

[1]. Defense counsel also argued that the destruction of evidence constituted a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). He does not reiterate that argument on appeal.

witness Corporal Brian Donohoe, the property and evidence supervisor for the Sheriff's Office. The court agreed and Corporal Donohoe was called to the stand. He testified as follows.

Every item of evidence submitted to the Sheriff's Office is accompanied by a property report stating the case number. Evidence is stored in numerical order by year and case number. "General" evidence (the category in which all the items in this case fit, except the drugs and currency) is put in a padlocked locker when received and, shortly thereafter, is moved to a locked vault.

On March 26, 2008, the day of the events involving the appellant, Corporal Donohoe received property report forms for several items of evidence associated with this case. The items included a USC 300 digital scale, a silver Cingular cell phone, and a camouflage backpack containing glassine baggies, a cell phone charger, batteries, and a comb. That same day, Corporal Donohoe also received property report forms associated with this case for a cell phone, a driver's license, keys, a PNC bank card, two folding knives, two pictures, and a black folder. All of these items were stored in the vault for general property in the property room at the Sheriff's Office. In addition, Corporal Donohoe received marijuana, cocaine, and $1,311 in United States currency associated with this case. The drugs were stored in a separate evidence locker specifically for controlled dangerous substances. The currency was deposited with the county financial office.

On April 11, 2008, in response to a property form submitted by Deputy Arnold the day before, Corporal Donohoe released the driver's license, keys, PNC bank card, two folding knives, two pictures, a cell phone (different from the silver Cingular cell phone), and black folder to the appellant's girlfriend.

The Sheriff's Office follows a routine annual purging procedure for evidence collected the previous year. Pursuant to the procedure, the seizing deputy (i.e., the deputy who seized the evidence to begin with) is sent a property disposal form listing the evidence. The seizing deputy fills out the form, indicating

whether the evidence should be "held, destroyed, or returned to the owner" and whether the evidence is associated with active warrants, investigations, or criminal proceedings.

In September 2009, Corporal Donohoe issued over 600 property disposal forms for evidence collected in 2008. On September 29, 2009, such a form listing the backpack, the silver Cingular cell phone, and the USC 300 digital scale in this case was issued to Deputy Taylor, who mistakenly was identified in the computer system as the seizing officer. In fact, Deputy Matthew Cook was the seizing officer for those items. Therefore, the property disposal form for those items should have been issued to Deputy Cook. It was not, however.

On November 3, 2009, Deputy Taylor returned the property disposal form marking the three items for destruction. He did not fill in the top portion of the form with respect to active warrants, investigations, or criminal cases associated with the evidence. According to Corporal Donohoe, the top portion of the form is for the convenience of the seizing officer, and is not reviewed by him or the staff in the property room. Deputy Taylor submitted the property disposal form on November 3, 2009. The items were destroyed on November 5, 2009. All items remaining inside the backpack would have been destroyed when the backpack was destroyed.

Corporal Donohoe testified that the Sheriff's Office property room never received any crash scene photographs associated with this case and that it would not be usual for photographs of that sort to be submitted to the Sheriff's Office property room for housing.

At the conclusion of Corporal Donohoe's testimony, the court found as a fact that the November 5, 2009 destruction of items of evidence in this case (the backpack and its contents, the silver Cingular cell phone, and the digital scale with residue) was "part of an annual purge of the 2008 Wicomico County Sheriff's Department inventory." It found that "the destruction of this evidence was done in a routine administrative fashion" and was "not done in bad faith or with the intent to cause any injustice to [the appellant]." The court also

found that the prosecutor did not know that the evidence had been destroyed until January 15, 2009, and that "there's no evidence that the State, through its law-enforcement officers or other agents, willfully suppressed any evidence." The court further found that there was no evidence that "what was destroyed was favorable to [the appellant]." The court denied the appellant's motion to dismiss.

On appeal, relying primarily upon and *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), and *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), the appellant contends the State violated his due process rights by destroying the backpack and its contents, the silver Cingular cell phone, the digital scale with residue, and 11 crash scene photographs. Before discussing the specifics of his contention, it will be helpful to review those cases.

In *Trombetta*, two defendants were convicted of driving while intoxicated. During their initial traffic stops, each defendant had submitted to a breath test to determine his blood-alcohol concentration ("BAC"). Each defendant's BAC tested at higher than .10 percent, the legal limit in California at that time. The State did not preserve the breath samples. On appeal, the defendants argued that the State had violated their due process rights by not preserving the breath samples because, without the samples, they had no opportunity to conduct re-tests and to impeach the test results introduced into evidence by the State. The California Court of Appeals agreed, and reversed the convictions.

The United States Supreme Court granted *certiorari* and reversed. It reviewed its prior access-to-evidence cases, which established that the prosecution must disclose evidence that either is material to the defendant's guilt or relevant to the punishment to be imposed. It noted that in prior decisions it had "suggested that the Federal Government might transgress constitutional limitations if it exercised its sovereign powers so as to hamper a criminal defendant's preparation for trial." *Trombetta*, 467 U.S. at 486, 104 S.Ct. 2528.

Acknowledging the difficulty in fashioning rules and remedies regarding the preservation of evidence, the Court looked for guidance in *Killian v. United States,* 368 U.S. 231, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961), in which it had addressed the government's failure to preserve potentially exculpatory evidence. In *Killian,* F.B.I. agents had taken notes while interviewing witnesses. They prepared an investigatory report from the notes, and then threw the notes away. The Court ruled that the defendant's due process rights had not been violated because the notes only were made for the purpose of later transferring the information they contained, and because the notes were destroyed in good faith and in accordance with the F.B.I.'s standard practice.

In *Trombetta,* the Court analogized to *Killian* and concluded that the officers had acted in good faith and in accordance with standard departmental practices when they failed to preserve the breath samples. The Court held:

> Whatever duty the Constitution imposes on the State to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality ... evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

467 U.S. at 488–89, 104 S.Ct. 2528 (citing *United States v. Agurs,* 427 U.S. 97, 109–110, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (footnote omitted)).

In *Youngblood,* the Court was asked to determine to what extent due process requires the State to preserve evidence that does not satisfy the *Trombetta* constitutional materiality test, but still is potentially exculpatory. The defendant was convicted of child molestation, sexual assault, and kidnapping. After the assault occurred, the victim had been taken to the hospital where a physician used a "sexual assault kit" to collect various samples resulting from the attack. The sam-

ples were collected but not tested. Police officers also collected the boy's clothing, but failed either to refrigerate or freeze it. At trial, expert witnesses testified "as to what might have been shown by tests performed on the samples shortly after they were gathered, or by later tests performed on the samples from the boy's clothing had the clothing been properly refrigerated." *Id.* at 54, 109 S.Ct. 333.

The Arizona Court of Appeals reversed the conviction, holding that because identity was an issue at trial, and the sample evidence could have established the perpetrator's identity, the evidence was material to the defense and the failure to preserve it was a denial of the defendant's due process rights.

The United States Supreme Court reversed. It distinguished the case from *Trombetta* in two ways: First, the evidence in *Trombetta* had "apparent" exculpatory value, and therefore was constitutionally material, whereas, in Youngblood's case it was a mere "possibility" that the semen samples would have exculpated him if they had been preserved or tested. That mere possibility did not satisfy the standard of constitutional materiality. Second, under *Trombetta*, the exculpatory value of evidence must have been apparent "before the evidence was destroyed." 488 U.S. at 57 n. *, 109 S.Ct. 333 (emphasis in original) (quoting *Trombetta*, 467 U.S. at 489, 104 S.Ct. 2528). The semen samples were "simply an avenue of investigation that might have led in any number of directions," and therefore did not have apparent exculpatory value. *Id.*

While recognizing that good faith is not relevant when constitutionally material evidence has been destroyed, the *Youngblood* Court determined that "the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Id.* at 57, 109 S.Ct. 333. The Court held that the State does not have an "absolute duty to retain and to preserve all material

that might be of conceivable evidentiary significance in a particular prosecution." *Id.* at 58, 109 S.Ct. 333. When evidence is only "potentially useful," not constitutionally material, the State's failure to preserve it is not a denial of due process "unless a criminal defendant can show bad faith on the part of the police." *Id.* The Supreme Court assessed the evidence and concluded that "there was no suggestion of bad faith on the part of the police." *Id.* On that basis, the Court held that there was no due process violation.

■ We return to the case at bar. The appellant does not contend the evidence the State destroyed was constitutionally material. He contends the evidence was potentially useful, however, and that bad faith was established because the State failed to act in accordance with established police procedures and the items were destroyed after defense counsel had filed a discovery request.

The State acknowledges that the evidence that was destroyed was potentially useful to the defense. It maintains that the evidence was not destroyed in bad faith, however, because the police officers responsible for its destruction were not aware that it had any exculpatory value. Furthermore, although police procedures were not followed, the officers' conduct was at most negligent, which is insufficient to establish bad faith.

■ As noted, the trial court found that the police officers did not act in bad faith in destroying the evidence in this case. We agree. Although the appellant correctly points out that the failure to follow police procedures *can* indicate bad faith, that is but one factor to be considered. *See Patterson v. State,* 356 Md. 677, 697, 741 A.2d 1119 (1999); *Elliott v. State,* 185 Md.App. 692, 736–37, 972 A.2d 354 (2009). We must also consider whether the police knew of the evidence's potential exculpatory value before it was destroyed. *Youngblood,* 488 U.S. at 56–57 n. *, 109 S.Ct. 333.

■ The evidence at issue was seized on March 26, 2008, and then was housed in the Sheriff's Office's evidence room.

Because the appellant was so seriously injured in the crash, there was a long delay in charging him, and the evidence remained in the evidence room for well over a year. In September of 2009, as part of the annual purge process for evidence seized the year before (2008), Corporal Donohoe mistakenly issued a property disposal form to Deputy Taylor for the backpack, digital scale, and Cingular cell phone. The mistake happened because Deputy Taylor's name was incorrectly entered in the computer as the seizing officer. When Deputy Taylor received the property disposal form, he did not recall either the case name or the case number. He knew, however, that he did not have any upcoming cases relating to the evidence. For that reason, he indicated on the property form that the items should be destroyed.[2]

There was no evidence that anyone was aware of the mistake that resulted in the property disposal form being sent to Deputy Taylor until after the items already had been destroyed. At most, the failure to follow procedures in this case constituted negligence, which is insufficient to establish bad faith. *Youngblood,* 488 U.S. at 58, 109 S.Ct. 333 (remarking that "[t]he failure of the police to refrigerate the clothing and to perform tests on the semen samples can at worst be described as negligent."); *Patterson,* 356 Md. at 697, 741 A.2d 1119. Furthermore, there was no evidence that either Corporal Donohoe or Deputy Taylor was aware of the potential exculpatory value of the items until after they were destroyed. Corporal Donohoe sent the property disposal form as part of the routine purging process, to determine whether the items were evidence in an active case, and Deputy Taylor, not realizing that the property disposal form had been sent to him in error, filled out the form to indicate that the evidence

---

**2.** The record discloses no information about how the 11 crash scene photographs taken by the EMT came to be lost. Those photographs never were kept at the Sheriff's Office. Although the appellant raised the loss of the photographs as grounds for dismissing the charges, he failed to explain how the State acted in bad faith by losing the photographs. The mere fact that the photographs somehow were lost does not establish bad faith.

should be destroyed because he did not have any upcoming cases relating to the evidence. The fact that the police were unaware of any potential exculpatory value when the evidence was destroyed also weighs against a finding of bad faith. *See Youngblood,* 488 U.S. at 56–57 n. *, 109 S.Ct. 333.

We agree with the trial judge that the evidence in this case did not support a finding of bad faith on the part of the law enforcement officers. Accordingly, the appellant's due process rights were not denied, and the trial court did not err in denying his motion to dismiss.

## II.

### *Sufficiency of the Evidence*

The appellant contends the evidence adduced at trial, viewed in the light most favorable to the State, was legally insufficient to support a finding beyond a reasonable doubt that he was in possession of the marijuana, cocaine, and paraphernalia that were in the camouflage backpack found in the field where the sedan crashed and overturned. Because possession is an element of all the crimes he was convicted of, he maintains that the evidence was legally insufficient to support his convictions. The State responds that the evidence was legally sufficient to support a reasonable finding that the appellant was in possession of all those items, beyond a reasonable doubt.

On appellate review of the sufficiency of the evidence to support a criminal conviction, we consider the evidence in the light most favorable to the State as the prevailing party. *Tarray v. State,* 410 Md. 594, 608, 979 A.2d 729 (2009). We ask whether, when the evidence is so viewed, any reasonable juror could find all the elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original); *accord Tarray,* 410 Md. at 607–08, 979 A.2d 729. We do not weigh the evidence or concern ourselves with the credibility of witnesses. *State v. Smith,* 374 Md. 527, 533–34, 823 A.2d 664 (2003).

■ The appellant was convicted of possession of cocaine and marijuana, in violation of Md.Code (2000, 2010 Supp.), section 5–601(a)(1) of the Criminal Law Article ("C.L."); possession of those substances with intent to distribute, in violation of CL section 5–602(2); and possession of drug paraphernalia, in violation of CL section 5–619(c). All of those crimes require proof of the element of possession; and, for purposes of Title 5 of the Criminal Law Article, "possess" means "to exercise actual or constructive dominion or control over a thing by one or more persons." CL § 5–101(u). To be in actual possession of contraband, the item must be found on the individual's person. *See State v. Suddith*, 379 Md. 425, 432, 842 A.2d 716 (2004). The State does not argue that the appellant was in actual possession of the contraband at issue, but maintains that he was in constructive possession. To establish constructive possession, the State must prove that the accused exercised some sort of dominion or control over the substance. *Smith v. State*, 415 Md. 174, 187, 999 A.2d 986 (2010). Knowledge is an essential element to all these possessory crimes. *Moye v. State*, 369 Md. 2, 14, 796 A.2d 821 (2002); *Dawkins v. State*, 313 Md. 638, 649, 547 A.2d 1041 (1988).

■ The evidence at trial showed that when the speeding sedan crashed and overturned, items fell out of it. Throughout the chase and the crash, Deputy Arnold never lost sight of the sedan. A camera mounted to the dash board of his patrol vehicle recorded the entire series of events. A DVD recording from the camera was admitted into evidence at trial and played for the jury. The DVD showed several items coming out of the sedan as it crashed and overturned. Although Deputy Arnold could not specifically identify the backpack as one of those items, he testified that the backpack was found "several feet" from the vehicle after the crash. Deputy Cook testified that he found the backpack approximately 20 feet away from the vehicle. Using a photograph of the crash scene, he showed the jury the location where the backpack was found. Deputy Cook also authenticated a photograph as

an accurate representation of the crash scene on the day of the accident, and identified the backpack in the photograph.

From this evidence, reasonable jurors could have concluded that the backpack was in the sedan before the accident occurred, and came out of the sedan when it crashed and overturned.

■ The appellant argues that, even if the contraband was inside the sedan before the crash, because he was not the owner of the sedan, the State was required to prove that he was in joint possession of the items.[3] He is incorrect. The mere fact that the appellant did not own the sedan did not make this a joint possession case. The significant fact here was not ownership, but that the appellant was in sole possession of the sedan and was driving it at all relevant times. A fact-finder reasonably may infer that the driver of a vehicle knows its contents, including contraband. *Smith*, 374 Md. at 550, 823 A.2d 664 ("We hold that the status of a person in a vehicle who is the driver, whether that person actually owns, is merely the driver or is the lessee of the vehicle, permits an inference, by a fact-finder, of knowledge, by that person, of contraband found in that vehicle. In other words, the knowledge of the contents of the vehicle can be imputed to the driver of the vehicle. That inference in the case *sub judice*, based upon the direct and circumstantial evidence presented, would permit a fact-finder to be convinced beyond a reasonable doubt that respondent had knowledge of the [contraband] in the vehicle."); *Neal v. State*, 191 Md.App. 297, 317, 991 A.2d 159 (2010) ("[A] fact finder could infer that appellant possessed the cocaine simply by virtue of his status as the driver and sole occupant of the vehicle. . . .").

The jurors in this case reasonably could infer that the backpack (and its contents) were inside the sedan before it crashed and that the appellant, as the driver and sole occupant of the sedan, knew that the contraband was in the sedan.

---

**3.** The evidence at trial established that the sedan was registered to one Brett Culver Bennett.

They further reasonably could infer from the fact that the appellant was driving the vehicle that contained the contraband that he was exercising dominion or control over the contraband. *Neal,* at 316, 991 A.2d 159 ("A person has constructive possession over contraband when he or she has dominion or control over the contraband itself or over the premises or vehicle in which it was concealed.)." The evidence that the appellant took flight in the sedan, attempting to elude the police when Deputy Arnold tried to effect a traffic stop, further supported a reasonable finding that the appellant knew of the presence of the contraband in the sedan. *Stuckey v. State,* 141 Md.App. 143, 174, 784 A.2d 652 (2001).

Accordingly, the evidence was legally sufficient to support a finding of possession of the contraband, beyond a reasonable doubt, and therefore to support the convictions.

## III.

### *Requested Jury Instruction*

Defense counsel requested a jury instruction telling the jurors that they could infer from a finding on their part that the State destroyed evidence that the evidence destroyed was unfavorable to the prosecution case. The court declined to give the instruction, explaining that in Maryland "with respect to matters of fact as opposed to matters of law, an inference may be appropriate but an instruction is not required." Employing the same reasoning, the court declined to give the State's requested jury instruction on flight. The court made clear that defense counsel could argue the adverse inference from destruction of evidence to the jury (as the State could make an argument based on flight).

The appellant contends the trial court abused its discretion by denying his request for a jury instruction on the destruction of evidence. The State responds that the court was not obligated to give such an instruction, as it concerned a matter of fact, not law, and did not abuse its discretion in rejecting it.

On review of a trial court's ruling granting or declining a proposed jury instruction, we consider whether the instruction was generated by the evidence, whether it was a correct statement of law, and whether it otherwise was fairly covered by the instructions actually given. *Gunning v. State,* 347 Md. 332, 348, 701 A.2d 374 (1997); *Grandison v. State,* 341 Md. 175, 211, 670 A.2d 398 (1995). We review the trial court's decision not to grant a jury instruction under an abuse of discretion standard. *Thompson v. State,* 393 Md. 291, 311, 901 A.2d 208 (2006).

Here, the parties do not dispute that the issue of destruction of evidence was generated by the evidence, and that the instruction the appellant sought was not otherwise covered by the instructions the court gave. The question we must answer is whether the proposed instruction concerned a point of law or a point of fact; and if it was a point of fact, whether any instruction was required.

Rule 4–325 requires that the trial court instruct the jury as to the applicable law in a case. In *Patterson v. State,* 356 Md. at 684, 741 A.2d 1119, the Court held that the rule does not apply to "factual matters or inferences of fact," however. The court generally is not required to instruct the jury as to the presence or absence of most evidentiary inferences, including "missing evidence" inferences. *Id.* Recently, however, in *Cost v. State,* 417 Md. 360, 381–82 (2010), the Court found in an exceptional case that it was an abuse of discretion for a trial court not to give a requested "missing evidence" instruction. To decide the issue in the case at bar, we must review *Patterson* and *Cost.*

In *Patterson,* the defendant was arrested during a traffic stop when police determined that his driver's license had been suspended. During an inventory search of his vehicle, the arresting officer found in the trunk a dirty jacket with a plastic baggie in one of the pockets. Inside the baggie were a number of individually wrapped rocks of crack cocaine. The police did not collect the jacket as evidence and no one knew what became of it. The defendant was charged with posses-

sion of cocaine with intent to distribute. At trial, the defendant asked the court to give the jury a missing evidence instruction, telling them that they could infer from he fact that the jacket was not collected by the State that its admission into evidence would have been adverse to the State's case. The trial court declined to give the requested instruction. The defendant was convicted.

The case ultimately was decided by the Court of Appeals, which affirmed the judgment of conviction. First, as in this case, the Court in *Patterson* rejected the defendant's argument that the State had violated his due process rights by failing to collect the jacket. Recognizing that due process under the Maryland Declaration of Rights is *in pari materia* with the Due Process Clause of the Fourteenth Amendment, the Court applied the bad faith test as established in *Youngblood*. It concluded that the defendant had offered no evidence that the State had intentionally suppressed or destroyed the jacket; indeed, no evidence was adduced to show that the police had considered the jacket to have had any evidentiary value at all. The Court determined that, at most, the failure of the police to seize and retain the jacket as potentially exculpatory evidence might have constituted negligence, which does not amount to bad faith under *Youngblood*.

Second, the *Patterson* Court rejected the defendant's argument that the trial court's refusal to grant a missing evidence instruction violated his due process rights. The Court held that, although an adverse inference may be drawn from the destruction of evidence, against the party who destroyed the evidence, an instruction on such a factual inference is not required to be given. Counsel is permitted to argue the adverse inference to the jury, but a jury instruction about the inference need not be given.

In *Cost*, the defendant was charged with crimes stemming from the stabbing of a fellow prisoner at the Maryland Correctional Adjustment Center ("MCAC"). The stabbing took place in a prison cell. After the attack, Major Donna Hansen, the investigative officer, did not collect any evidence from

inside the prison cell. On the night of the attack, she telephoned the Department of Public Safety and Correctional Services' Internal Investigative Unit ("IIU"). Five days later, she spoke to a detective with the IIU, telling him that the cell was sealed and asking that the IIU release the cell. Thereafter, a detective from the IIU went to MCAC to investigate the matter, but could not examine the cell because it already had been cleaned and no physical evidence from it had been preserved. The victim's clothing was not accepted by the IIU's crime lab because of its age and the lack of chain of custody. *Id.* at 367, 10 A.3d 184.

At trial, the court denied the defendant's request for a missing evidence instruction, reasoning that there was nothing to show that the State deliberately had destroyed the evidence. After the defendant was convicted of reckless endangerment, he appealed. Ultimately, the Court of Appeals reversed, holding that the trial court had abused its discretion by not granting the requested instruction. In doing so, the Court distinguished *Patterson.*

The *Cost* Court recognized that *Patterson* remains good law, insofar as it holds that Maryland's due process constitutional protections do not extend beyond *Youngblood,* but concluded that the decision left open the question of what substantive Maryland evidence law requires. Remarking that *Patterson* held that trial courts *ordinarily* need not instruct the jurors on *most* evidentiary matters, the Court reasoned that *Patterson* did not establish an absolute rule, and that exceptions could be found. The Court observed that the unusual facts in *Cost* stood "in stark contrast to those in *Patterson.*" *Id.* 417 Md. at 380, 10 A.3d 184. Whereas the jacket in *Patterson* was never collected as evidence, and was not likely to have been used as evidence had it been collected, the crime scene in *Cost* had been sealed off from use pending investigation and the items held in the cell (for example a blood-stained linens and clothing, dried blood on the floor, and the victim's clothing) were of a type that ordinarily would be collected and analyzed. In fact, the clothing eventually was submitted for testing, but

was rejected because it had not been timely submitted and because its chain of custody had not been preserved.

The *Cost* Court held that the evidence that was destroyed went to the heart of the defendant's case, and that merely allowing counsel to argue the adverse inference from the destruction of evidence would be insufficient to ensure that the interest of justice was protected. Under those exceptional circumstances, the trial court was required to instruct the jury that it could infer that the evidence that was destroyed was unfavorable to the State. The Court took care, however, to explain that its holding "does not require a trial court to grant a missing evidence instruction, as a matter of course, whenever the defendant alleges non-production of evidence that the State might have introduced." *Id.* at 382. A trial court only will abuse its discretion in denying a request for a missing evidence instruction if " 'the jury instructions, taken as a whole, [do not] sufficiently protect the defendant's rights' and 'cover adequately the issues raised by the evidence.' " *Id.* (alteration in original) (quoting *Fleming v. State*, 373 Md. 426, 433, 818 A.2d 1117 (2003)). When destroyed evidence was not central to the defense case, was "not the type of evidence usually collected by the state, or [was] not already in the state's custody … a trial court may well be within its discretion to refuse" to give a missing evidence instruction. *Id.*

We return to the case at bar. Clearly, the missing evidence instruction that the appellant requested concerned a point of fact, not a point of law. We must decide, however, whether the circumstances here were so exceptional as to have required the trial court to give the instruction, under *Cost.* Naturally, the appellant maintains this case falls squarely into the exception recognized in *Cost.* He argues that the backpack and the items found inside of it, including a cellular phone charger and a comb, could have been tested for fingerprints. Also, the charger could have been tested to see if it was compatible with either of the cell phones found to have been in the appellant's possession. If compatibility were not found, the appellant argues, that evidence would tend to show that

the backpack was not his. The appellant also argues that lost photographs were critical evidence because they would have shown the position of the backpack in relation to the crashed sedan. In short, he takes the position that the evidence that was destroyed was "highly relevant" to his defense and was in the State's possession when it was destroyed. Therefore, the trial court abused its discretion by denying the missing evidence instruction.

We disagree. Unlike the evidence that was destroyed in Cost, the evidence that was destroyed in this case was not critical to the defense and was not of a sort that usually would be subjected to forensic testing. In *Cost*, the missing evidence could have directly contradicted the State's allegation that the defendant committed the stabbing. The same was not true here. If the backpack, phone charger, or comb had been fingerprinted, and the results were as favorable as possible to the appellant—his fingerprints were not found, and fingerprints of another (or others) were found—that evidence would not have negated the evidence against the appellant. Just as the appellant was driving a car that belonged to someone else, he could have been using a backpack that belonged to someone else and contained items belonging to that person. Or, he could have been using a backpack that had been touched by someone else. The appellant need not have owned the CDS and paraphernalia to have been guilty of possessing those items and possessing with intent to distribute the CDS. Moreover, the baggies the marijuana and cocaine were found in were not destroyed; and they would have had more value to the appellant for testing purposes than the evidence that was destroyed. The appellant did not seek to have them tested, however.

Additionally, the evidence that was destroyed was not of a type suitable for fingerprint analysis, as Deputy Cook testified. Indeed, the appellant's expert witness testified that it is "extremely difficult" to remove fingerprints from cloth items, such as the backpack, and that dust or dirt "could have a disastrous affect on fingerprints." Thus, it is unlikely that

any tests performed on the destroyed items would have yielded any results.

Also, related evidence was admitted at trial. The officers present at the scene of the accident testified, and the appellant had the opportunity to question them as to the location of the backpack and its condition when they discovered it. Additionally, a DVD recording of the crash was admitted that showed items coming out of the vehicle as it overturned. Finally, one photograph that showed the backpack at the crash scene and where it was located in relation to the overturned sedan was admitted into evidence. Ironically, the appellant objected to that photograph coming into evidence. Given that there was evidence presented at trial regarding the backpack's location and condition, any further photographic evidence, while relevant, was neither necessary nor central to the defense.

Although the appellant is correct that the evidence in question was in police possession before it was destroyed, that fact alone is not sufficient to put this case in the category of *Cost.* To be sure, the destroyed evidence was potentially useful. It was neither central to the appellant's defense, nor the type of evidence that would ordinarily be tested and utilized at trial, as the evidence in *Cost* was. Unlike *Cost,* this was a " 'typical' case, likely to be repeated, in which some piece of crime scene evidence, *not of major import,* was not retained or analyzed." *Cost,* 417 Md. at 379–80 (emphasis added). Accordingly, the trial court did not abuse its discretion in declining to give the requested instruction on destruction of evidence.

**JUDGMENTS AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**